741 F.2d 628
 Hugo DENNIS, Jr., Lorraine Berry, Adelbert Bryan, Milton A.
Frett, Edgar Iles, Kenneth Mapp, Ruby Simmonds,
Lloyd L. Williams, Members of the
Fifteenth Legislature of the
Virgin Islands
v.
Juan LUIS, Governor of the Virgin Islands; Arnold M.
Golden, Acting Commissioner of Commerce, Appellants.
 No. 83-3633.
 United States Court of Appeals,
Third Circuit.
 Argued Feb. 27, 1984.
Decided Aug. 10, 1984.
Rehearing and Rehearing In Banc
Denied Sept. 11, 1984.
 
 Richard R. Knoepfel (argued), Chief, Civ.Div., Asst. Atty. Gen., Charlotte Amalie, St. Thomas, V.I., for appellants.
 Rhys S. Hodge (argued), Charlotte Amalie, St. Thomas, for appellees.
 Before ADAMS, HIGGINBOTHAM and SLOVITER, Circuit Judges.
 OPINION OF THE COURT
 A. LEON HIGGINBOTHAM, Jr., Circuit Judge.
 
 
 1
 This case involves a suit for injunctive and declaratory relief brought by eight members of the Virgin Islands Fifteenth Legislature. These legislators challenged Governor Juan Luis' (the "Governor") appointment of Arnold M. Golden ("Golden") as "acting" Commissioner of Commerce. The district court ruled that the Governor's authority to make temporary appointments was controlled by 3 V.I.C. Sec. 64(a) and that section 64(a) did not authorize the Governor to appoint an "acting" Commissioner of Commerce. Relying on section 64(a), the district court concluded that at the time Golden was appointed, the Governor was empowered only to make "recess" appointments, and not temporary appointments of any other sort. Thus, it held that under 3 V.I.C. Sec. 64(a) Golden was a recess appointee. Because a recess appointee's term is defined by statute and because the Governor was without the power to make any other temporary appointments including acting appointments, the district court ordered Golden to be removed from office after determining that Golden's term as a recess appointee had expired as of December 12, 1983.
 
 
 2
 On appeal, both the Governor and Golden challenge the legislators' standing to maintain the underlying action. In the alternative, they argue that the district court erred in not recognizing the Governor's right to make any appointments other than recess appointments, and therefore, erred in ordering Golden's removal from office. Moreover, they assert that, notwithstanding the above, equitable considerations warrant a dismissal under the Riegle doctrine.[1]
 
 
 3
 Although we agree with the district court's conclusion that temporary appointments are governed by 3 V.I.C. Sec. 64(a), we find that the district court erred in its determination of when a recess appointment expires pursuant to section 64(a), and we will therefore vacate the judgment of the district court so that it can be re-entered in conformance with this opinion.
 
 I.
 
 4
 Golden's name was submitted on April 21, 1983 to the Fifteenth Legislature for the position of Commissioner of Commerce in the Virgin Islands. Under the Revised Organic Act of 1954, Sec. 16(c), 48 U.S.C. Sec. 1597(c), the legislature's advice and consent was necessary before an appointment to that position could be made. The legislature, however, on June 7, 1983 rejected Golden's nomination. Notwithstanding this rejection, the Governor thereafter on November 22, 1983 appointed Golden "acting" Commissioner of Commerce.
 
 
 5
 Following this appointment, eight of the fifteen members of the legislature filed suit in order to remove Golden from office. They asserted that "[t]he effect of the appointment ... is to usurp the doctrine of separation of powers and circumvent the process of advice and consent, thus violating a basic constitutional power conferred upon the Legislature ... by the United States Congress ...." Appendix ("App.") at 5.
 
 
 6
 Without addressing the constitutional issues raised by the plaintiffs, the district court ruled that the Governor's appointment powers are governed by 3 V.I.C. Sec. 64(a). In the district court's view, this statute contemplates only recess appointments for the time period in which Golden was appointed. The district court could find no authority permitting the Governor to make any other form of non-permanent appointments. Accordingly, it considered Golden a recess appointee and having then found that the time period for recess appointments had expired, it held Golden's continued occupancy of the position of Commissioner of Commerce to be unlawful. The district court thus issued an injunction directing that the Governor remove Golden as "acting" Commissioner of Commerce. Golden's removal was stayed pending this appeal.[2]
 
 A.
 
 7
 Before turning to the merits of appellants' claim that the district court erred in ordering Golden's removal from office, we will consider appellants' challenge to the legislators' standing to maintain this action.[3]
 
 
 8
 The Governor and Golden argue that the legislators do not have standing because they have failed to allege a legally cognizable injury.
 
 
 9
 In making the determination as to whether the threshold requirements of standing are satisfied, we must "accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." Warth v. Seldin, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975). Moreover, throughout this standing inquiry, our focus will be "on the party seeking to get his complaint before a federal court and not on the issues he wishes to have adjudicated." Flast v. Cohen, 392 U.S. 83, 99, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947 (1968).
 
 
 10
 Recently, in Valley Forge Christian College v. Americans United for Separation of Church and State, 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982), the Supreme Court set forth the minimum constitutional requirements necessary to establish standing. In short, a party seeking standing must demonstrate: (i) an actual or threatened injury that was (ii) caused by the defendant's actions and is (iii) capable of judicial redress. Id. at 472, 102 S.Ct. at 758.
 
 
 11
 In this case, the injury alleged by the legislators in their complaint is that the Governor's appointment of Golden as "acting" Commissioner of Commerce after his nomination as a permanent appointee had been rejected by the legislators "usurp[ed] the doctrine of separation of powers and circumvent[ed] the process of advice and consent, thus violating a basic constitutional power conferred upon the Legislature of the Virgin Islands ...." App. at 5. Thus, they argue that their votes rejecting Golden's nomination were nullified by Golden's subsequent appointment to "acting" Commissioner. The Governor and Golden, on the other hand, maintain that this alleged injury does not constitute a legally cognizable injury sufficient to confer standing. Specifically, they assert that "[p]laintiffs may be more angry than the average person about this matter, but intensity of feelings ... does not confer standing, and they allege no personal injury." Appellant's Brief at 3.
 
 
 12
 In resolving this question, our analysis begins with the Virgin Islands Code which provides that the Commissioner of Commerce is to be "appointed by the Governor, with the advice and consent of the Legislature ...." 3 V.I.C. Sec. 332(b).
 
 
 13
 According to the legislators' allegations, the interest sought to be protected by this action is their unique statutory right to advise the Governor on executive appointments and to confer their approval or disapproval in this regard. Assuming these allegations to be true, we conclude that they allege a personal and legally cognizable interest peculiar to the legislators. See Riegle v. Federal Open Market Committee, 656 F.2d 873, 878-79 (D.C.Cir.), cert. denied, 454 U.S. 1082, 102 S.Ct. 636, 70 L.Ed.2d 616 (1981). The interest asserted is simply not a "generalized interest of all citizens in constitutional governance ...." Valley Forge Christian College, 102 S.Ct. at 769, quoting Schlesinger v. Reservists Committee to Stop the War, 418 U.S. 208, 217, 94 S.Ct. 2925, 2930, 41 L.Ed.2d 706 (1974). Since the right to advise and consent has been vested only in members of the legislature, and since only members of the legislature are bringing this action, the allegation that this right has been usurped by the Governor and Golden are sufficiently personal to constitute an injury in fact, thus satisfying the minimum constitutional requirements of standing. We therefore believe that it is reasonable to hold that the legislators have standing.
 
 B.
 
 14
 Having determined that the legislators have met the prerequisites for standing, we will next consider whether there are any prudential concerns which nonetheless require us to dismiss this suit.
 
 
 15
 Suits brought by legislators seeking to challenge executive actions and policies inevitably raise separation-of-powers concerns because of their political overtones. The Court of Appeals for the District of Columbia in Harrington v. Bush, 553 F.2d 190 (D.C.Cir.1977), observed that:
 
 
 16
 The standing and political question doctrines are both facets of the broader concept of justiciability and "... either the absence of standing or the presence of a political question suffices to prevent the power of the federal judiciary from being invoked by the complaining party." Schlesinger v. Reservists Committee to Stop the War, 418 U.S. 208, 215, 94 S.Ct. 2925, 2929, 41 L.Ed.2d 706 (1974).
 
 
 17
 Id. at 194, n. 6.
 
 
 18
 Focusing on the tensions generated by litigation initiated by legislative plaintiffs, who were dissatisfied members of Congress, Judge McGowan wrote in his seminal article, Congressmen in Court: The New Plaintiffs, that the "use of the standing doctrine to address the separation-of-powers concerns arising when federal legislators sue the executive branch in federal court is fraught with difficulties both in theory and in application." 15 Ga.L.Rev. 241, 256 (1981) (emphasis added).
 
 
 19
 Moving the site of such litigation from Washington, D.C. to the Caribbean vacation retreat of St. Thomas does not decrease the tension nor does it make the problems in either theory or application less "fraught with difficulties" than those described by Judge McGowan.
 
 
 20
 In this case, it is obvious that the court is being asked to resolve an intense power dispute between the legislature and the executive branch. Any judicial resolution of such a dispute has significant political implications in the struggles for dominance of, control of, or impact on a government.
 
 
 21
 Obviously, when the United States Congress passed the Revised Organic Act of 1954 granting the Virgin Islands legislature the right to advise on and consent to executive appointments. 48 U.S.C. Sec. 1597(c), it was intended that the democratically-elected legislative branch of the Virgin Islands act as a check and balance on the Governor's power. At the same time, by granting the Governor the right to make executive appointments, subject to the advice and consent of the Virgin Islands legislature, Congress intended to give the Governor substantial power in choosing those persons who would represent his views of how the key executive departments and the government should function.
 
 
 22
 Thus, our problem involves determining the court's role when these separate, independent branches of government--the executive and the legislative--clash and cannot resolve their difficulties on their own political turfs. Should legislators be allowed to use the judicial process to force the executive branch to comply with "the law of the land?" Or, phrased differently, should legislators be able to use the court to implement a victory that was won in the legislative hall and ignored in the executive mansion?
 
 
 23
 Obviously, similar litigation in the District of Columbia involving Congressmen as plaintiffs must be our analogue in analyzing this difficult separation-of-powers issue and in defining the role of judicial review.[4]
 
 
 24
 In 1981, having faced more than a decade of sensitive litigation, the United States Court of Appeals for the District of Columbia articulated a comprehensive jurisprudential theory defining the basis on which the courts should or should not dismiss suits filed by congressional plaintiffs against the executive branch. In Riegle v. Federal Open Market Committee, the court concluded that in those instances where Congressmen satisfy the traditional standing tests, the court may nevertheless dismiss the suit pursuant to the doctrine of "circumscribed equitable discretion." Riegle, 656 F.2d at 881. The Riegle court stated: "The most satisfactory means of translating our separation-of-powers concerns into principled decisionmaking is through a doctrine of circumscribed equitable discretion." Id. We shall refer to it as the "Riegle" doctrine.
 
 
 25
 By circumscribed equitable discretion, the court had in mind those situations "[w]hen a congressional plaintiff brings a suit involving circumstances in which legislative redress is not available or a private plaintiff would likely not qualify for standing ..." Id. at 882. They further stated:
 
 
 26
 We would welcome congressional plaintiff actions involving non-frivolous claims of unconstitutional action which, because they could not be brought by a private plaintiff and are not subject to legislative redress, would go unreviewed unless brought by a legislative plaintiff. In this last situation, there are no prudential considerations or separation-of-powers concerns which would outweigh the mandate of the federal courts to "say what the law is." Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803).
 
 
 27
 Id.
 
 
 28
 In this case, the Governor and Golden urge that we apply the Riegle doctrine here and that upon fair application, we would be required to dismiss the complaint.
 
 
 29
 While we respect the thoughtful analysis in the opinion written by Judge Robb in Riegle, we are not bound by the articulated doctrine, and we decline at this time to adopt it. Furthermore, even if we were to apply the standard articulated in Riegle, we believe that we would not be required to dismiss this suit. For, in addition to directing the dismissal of congressional plaintiffs' suits where traditional concepts of standing are not satisfied. Riegle mandates dismissal only where "the plaintiff has standing but could get legislative redress and a similar action could be brought by a private plaintiff." Riegle, 656 F.2d at 882.
 
 
 30
 In Reigle, a legislator sought injunctive relief in the form of an absolute prohibition of voting by Reserve Board members of the Federal Open Market Committee ("FOMC"). This relief was sought because Congressmen had failed in previous attempts to have it required that the five representatives of the Reserve Bank seats be limited to bank presidents appointed by the President with the advice and consent of the Senate. Senator Riegle argued that " '[b]y permitting the defendant individuals to act as officers of the United States when their nominations [had] never been submitted to the Senate,' [he was deprived] of his constitutional right to vote in determining the advice and consent of the Senate to the appointment of the five Reserve Bank members of the FOMC." Riegle, 656 F.2d at 877. Thus, in short, Senator Riegle challenged the procedure for constituting the FOMC which permitted nominations to be made without the advice and consent of the Senate. In resolving that dispute, the court concluded that
 
 
 31
 where a congressional plaintiff has standing to challenge the actions of those acting pursuant to a statute which could be repealed or amended by his colleagues, or where he alleges an injury which could be substantially cured by legislative action, our standard would counsel judicial restraint.
 
 
 32
 Riegle, 656 F.2d at 881 (emphasis added). Indeed, the Riegle court declared "there can be no doubt that Senator Riegle's congressional colleagues are capable of affording him substantial relief." Id. at 882. Therefore the court exercised its equitable discretion and dismissed the suit.
 
 
 33
 In at least two critical aspects, the instant case is the polar opposite of the Riegle case. To appreciate the significant differences, it is best to start with the perspective of the trial judge in Riegle, Judge Gesell, whose following findings were quoted with approval by the Court of Appeals:
 
 
 34
 Senator Riegle's injury is of a political nature, deriving solely from the acts or omissions of his colleagues and not in any way from the actions of the named defendants. Reuss v. Balles, 584 F.2d 461, 468 (D.C.Cir.1978). What the Court must decide is whether or not a Congressman from either chamber has standing to challenge the constitutionality of a statutory provision on which he has failed to persuade his colleagues in the past and remains free to attempt persuasion in the future. The Court concludes that to confer standing upon such a Congressman without more would improperly interfere with the legislative process.
 
 
 35
 Riegle, 656 F.2d at 877, quoting Riegle v. Federal Open Market Committee, 84 F.R.D. 114 (D.D.C.1979) (Gesell, J.) (emphasis added).
 
 
 36
 In contrast to Riegle, the plaintiffs here do not complain of the "acts or omissions of [their] colleagues." They complain of the acts or omissions of the defendants--the Governor and the Commissioners of Commerce. In Riegle the plaintiff complained because there was no mechanism which allowed or required the Senate to give their advice and consent on appointment of five Reserve Bank members to the Federal Open Market Committee.[5] Thus, in Riegle the concern was a statute which the plaintiff wanted to have enacted--but could not get sufficient colleagues to support.
 
 
 37
 In contrast, here the very advice and consent mechanism Senator Riegle sought is already in effect. The plaintiffs have "not failed to persuade [their] colleagues"; if they have failed, it is that they have not persuaded the Governor to recognize the legal limitations of his appointment powers. In short, this case concerns a flouting by the Governor of a law that has been in fact enacted. Consequently, we believe it appropriate for us to consider this case.
 
 
 38
 Accordingly, we turn now to a review of the district court's decision.
 
 II.
 
 39
 Though Gertrude Stein wrote "A rose is a rose is a rose," one could not say that in the Virgin Islands all commissioners are the same. There have been three different types of Commissioners of Commerce. There has been the Commissioner nominated by the Governor and approved by the legislature pursuant to 3 V.I.C. Sec. 332(b). There also has been a person such as Golden who is described as the "Acting" Commissioner but whose appointment rests not on any express authority. While the latter category of "Acting" Commissioner has no statutory authorization, apparently such appointments have been used in the past without complaint by the legislature. Finally, there also is a position known as the Recess Commissioner, that is, someone who is appointed pursuant to 3 V.I.C. Sec. 64(a) by the Governor while the legislature is out of session. The trial court considered the latter as the only type of valid interim appointment which does not require legislative approval. The district court thus reasoned that because the legislature was in recess when Golden was appointed on November 22, 1983, Golden was a recess appointee under section 64(a).
 
 
 40
 The Governor and Golden object to the district court's classification of Golden as a recess appointment and assert instead that the appointment was of a different genre, that of an "acting" appointment. Although they concede that there exists no statutory authority for an "acting" appointment, they rely on custom to support its validity. Recognizing that a recess appointment as defined by section 64(a) is for a limited term, they contend that it was intended that Golden's "acting" appointment be of indefinite duration depending on when the Governor submitted another nominee to the legislative body for consideration as a permanent appointee for the position of Commissioner of Commerce.
 
 
 41
 The defect in the appellants' argument is that by their theory there could be a complete nullification of the legislature's power of advice and consent--a power which was explicitly granted in the Organic Act of 1954. There would be no limit to the time period in which an "acting" executive officer could serve. Thus, anyone appointed as an acting executive officer could serve for the entire period of the Governor's term without ever having obtained the prerequisite approval of the legislature.
 
 
 42
 While on a political level such an approach would make life less frustrating for the Governor, it nevertheless would obliterate the concept of separation-of-powers--a doctrine which for centuries in this country has proven to have value despite the tensions between the legislative and the executive branches. Without legislation granting such extraordinary power to the Governor, we do not recognize such a right despite some sporadic uncontested practice to the contrary.
 
 
 43
 Section 64(a) is the legislative provision which governs temporary appointments. It states:(a) The Governor shall have power to fill any vacancy which happens during the recess of the Legislature in an office which is required by law to be filled with the advice and consent of the Legislature by making an appointment which shall expire at the end of the next session of the Legislature.
 
 
 44
 3 V.I.C. Sec. 64(a).
 
 
 45
 In this case, the district court made a finding of fact that the legislature was in recess at the time Golden's appointment was made; it also held that only recess appointments could be made without the advice and consent of the legislature. Therefore it concluded Golden must be considered a recess appointee. We do not believe that the district court's factual finding that the legislature was out of session was clearly erroneous; nor do we believe that the district court erred in considering Golden to be a recess appointee.
 
 
 46
 As to the issue of the Governor's power to make a recess appointment of Golden, the majority and the dissent travel significantly different routes. The fundamental difference between the majority and the dissent is that, in our view, the dissent confuses the obligation of the treasurer to withhold payments with the power of the Governor to make appointments. We believe that the dissent seriously dilutes the appointment power which the Governor has been granted generally under the Revised Organic Act of 1954, Sec. 16(c), 48 U.S.C. Sec. 1597(c) and particularly in 3 V.I.C. Sec. 64 which concerns recess appointments.
 
 
 47
 Section 64 is a replication of U.S.Const. Art. 2, Sec. 2, cl. 3 and 5 U.S.C. Sec. 5503 combined, which provide:
 
 Art. 2, Sec. 2, cl. 3:
 
 48
 The President shall have Power to fill up all Vacancies that may happen during the Recess of the Senate, by granting Commissions which shall expire at the End of their next Session.
 
 5 U.S.C. Sec. 5503 Recess Appointments:
 
 49
 (a) Payment for services may not be made from the Treasury of the United States to an individual appointed during a recess of the Senate to fill a vacancy in an existing office, if the vacancy existed while the Senate was in session and was by law required to be filled by and with the advice and consent of the Senate, until the appointee has been confirmed by the Senate. This subsection does not apply--
 
 
 50
 (1) if the vacancy arose within 30 days before the end of the session of the Senate;
 
 
 51
 (2) if, at the end of the session, a nomination for the office, other than the nomination of an individual appointed during the preceding recess of the Senate, was pending before the Senate for its advice and consent; or
 
 
 52
 (3) if a nomination for the office was rejected by the Senate within 30 days before the end of the session and an individual other than the one whose nomination was rejected thereafter receives a recess appointment.
 
 
 53
 (b) A nomination to fill a vacancy referred to by paragraph (1), (2), or (3) of subsection (a) of this section shall be submitted to the Senate not later than 40 days after the beginning of the next session of the Senate.
 
 
 54
 The dissent complains that we predicate our decision on section 64(a) rather than relying on sections 64(b) and (c). However, it should be noted that section 64(a) is the only section which speaks in terms of the power of the governor. In contrast, section 64(b) speaks in terms of the obligations of the treasurer and section 64(c) speaks as to the limitations of a recess appointee's power in hiring or dismissing personnel or significantly altering agency programs. Putting the cart before the horse, the dissent suggests that because there are some circumstances under which a recess commissioner may not be paid a full salary for his or her performance in office, the Governor, therefore, lacks the power to make the appointment. Certainly, if the legislature had so intended it could have stated in section (b) that it was imposing limitations on the power of the Governor to appoint rather than merely noting the limitations on the treasurer's disbursement. However, instead of imposing prohibitions on the Governor in section 64(b), the prohibitions were merely applied to the treasurer. Thus, by a literal reading of sections 64(a) and (b) there is left the "interstitial space" where a person could be appointed a recess commissioner by the Governor and not be paid a commissioner's salary.
 
 
 55
 The dissent assumes that no one will work unless they are paid in full and therefore reads section 64(b) broader than its literal language. In reaching this result, the dissent disregards decades of experiences involving similar federal and constitutional provisions, and the dissent's view implicitly sanctions a dilution of the U.S. President's power, despite more than a century of opinions by Attorney Generals that are in fundamental conflict with the position of the dissent.
 
 
 56
 As originally enacted in the United States, the recess payment provision prohibited recess appointees from being paid until Senate confirmation of the appointment. Thus, the act of February 9, 1863 (Rev.Stat., sec. 1768), stated as follows:
 
 
 57
 No money shall be paid from the Treasury as salary to any person appointed during the recess of the Senate, to fill a vacancy in any existing office, if the vacancy existed while the Senate was in session and was by law required to be filled by and with the advice and consent of the Senate, until such appointee has been confirmed by the Senate.
 
 
 58
 The first U.S. Attorney General to consider this provision interpreted it as follows:
 
 
 59
 In postponing the payment of the salary of the appointee until the Senate has given its assent to the appointment, [Congress] concedes the right of the President to appoint, although it undoubtedly embarrasses the exercise of that right by subjecting the appointee to conditions which are somewhat onerous.
 
 
 60
 16 Op.Atty.Gen. 522, 531 (1880).
 
 
 61
 The act was amended, 5 U.S.C. Sec. 56, in 1940 to "render the existing prohibition on the payment of salaries more flexible." H.Rept. 2646, 76th Cong., 3d sess., p. 1. Though amended, the statute was again interpreted in 1960 by another U.S. Attorney General as recognizing the President's appointment power to be separate from the recess appointment payment provision of 5 U.S.C. Sec. 56, which is now codified as 5 U.S.C. Sec. 5503. He noted that:
 
 
 62
 5 U.S.C. Sec. 56, which originally prohibited the payment of appropriated funds as salary to a person who received a recess appointment if the vacancy existed while the Senate was in session implicitly assumed that the power existed, but sought to render it ineffective by prohibiting the payment of the salary to the person so appointed.
 
 
 63
 41 Op.Atty.Gen. 463, 466 (1960) (emphasis added). Thus, the rationale articulated by the dissent, seriously limiting the Governor's appointment power, would support a similar limitation of the power of the President of the United States.
 
 
 64
 By the record in this case we know that in the Virgin Islands individuals who served as the recess commissioner often have also had a valid appointment for a position at a lower salary level. Some individuals would probably be willing to serve as a recess commissioner even when paid at a salary less than that to which a commissioner is entitled. But the dissent assumes that unless one is paid the full amount of the Commissioner's salary, he or she cannot work at all as a recess commissioner. Though the 13th Amendment prohibits involuntary servitude, it does not prohibit voluntary public service where one is willing to work without compensation or without full compensation.
 
 III.
 
 65
 We next consider whether the district court erred in its finding that Golden's term as a recess appointee expired on December 12, 1983. Under section 64(a), a recess appointment expires "at the end of the next session of the Legislature." Thus, to determine when Golden's appointment ended, we must define a "session" of the Virgin Islands Legislature.
 
 
 66
 Section 7(a) of the Revised Organic Act of 1954 provides in relevant part that
 
 
 67
 Regular sessions of the legislature shall be held annually, commencing on the second Monday in January (unless the legislature shall by law fix a different date), and shall continue for such term as the legislature may provide.
 
 
 68
 48 U.S.C. Sec. 1573(a) (emphasis added). The Rules of the Senate for the Virgin Islands Fifteenth Legislature (the "Senate Rules"), Chapter 2, section 201(a) defines a "regular session" as one which
 
 
 69
 (a) shall commence annually on the second Monday in January and shall continue on the following days, exclusive of Fridays, Saturdays, Sundays and legal holidays:
 
 
 70
 1) from the first Monday in March for four calendar weeks;
 
 
 71
 2) from the first Monday in May through June 16; and
 
 
 72
 3) from the third Monday in September through the second Thursday in October.
 
 
 73
 In addition to the regular sessions, the Governor has the authority pursuant to the Revised Organic Act of 1954, section 7, to "call special sessions of the legislature at any time when in his opinion the public interest may require it." 48 U.S.C. Sec. 1573(a) (emphasis added). Furthermore, the Senate Rules, Chapter 2, section 201(b) also permit the President of the legislature to "convene the Legislature at his or her discretion, but not after adjournment sine die."
 
 
 74
 In this case, the district court found that Golden's term as a recess appointee expired on December 12, 1983, at the end of a one-day "special" session called by the President pursuant to section 201(b), Chapter 2, of the Senate Rules. By the district court's ruling, a session could either be a regular session or a special session.
 
 
 75
 We believe that the district court's definition of session is too broad when it incorporates special session, and that under section 64(a), session should encompass only regular sessions of the legislature as defined by section 201(a), Chapter 2, of the Senate Rules. Under the district court's view, when the legislature is not in session, a person chosen as a recess appointee one day could have his or her appointment terminated the next day or soon thereafter if a special session is held immediately after the appointment.
 
 
 76
 We do not believe that the drafters of section 64(a) intended to create administrative chaos in the functioning of government; rather, they intended to have a deliberate process whereby temporary appointees could administer the work of their department while the legislature could in an unhurried fashion determine whether they would give their consent to the nominee selected to fill the vacancy. Obviously, the drafters of section 64(a) did not want a process where the Governor would be obligated to make in a short period of days several recess nominations to the same office. Yet, by the trial court's conclusion that special sessions are included in the application of section 64(a), there could be utter chaos if special sessions were included in defining session under section 64(a). Moreover, it is unlikely that the drafters of section 64(a) intended that recess appointees should bounce back and forth like ping pong balls in a tournament. The only way there can be a modicum of stability in the administration of government executive offices and departments is by reading section 64(a) as incorporating only regular sessions of the Virgin Islands Legislature. Such a result would grant some continuity in the management of the executive offices. We therefore conclude that for purposes of determining the expiration date of recess appointments under section 64(a), "session" shall include only those regular sessions of the Virgin Island Legislature.
 
 
 77
 Applying that definition to the facts in this case, we find that in accordance with section 201(a) of the Senate Rules, Golden's term as Recess Commissioner of Commerce expired at the end of the regular session scheduled to commence on the "second Monday in January" of 1984. Thus, the district court erred in finding that Golden's recess appointment as Commissioner of Commerce had expired on December 12, 1983, and the district court erred in concluding that as of December 23, 1983, (the date of the judgment), Golden was in office unlawfully.
 
 
 78
 Although the district court was in error on December 23, 1983, when it ordered Golden removed as Commissioner of Commerce, by the passage of time Golden is now ineligible to serve as the Recess Commissioner of Commerce. We will therefore vacate the judgment of the district court and will direct the district court to enter an order in conformance with this opinion.
 
 
 79
 ADAMS, Circuit Judge, concurring in part and dissenting in part.
 
 
 80
 As I see the matter before us, there are two questions this Court must address. The first is a justiciability concern that invariably arises when courts are confronted with disputes between the legislature and the executive. Second, we must decide whether the Governor of the Virgin Islands may, after a candidate for appointment to a cabinet position has been rejected by the Senate, appoint the self-same individual to the same position in an acting capacity.
 
 
 81
 Although I agree with the majority that Arnold Golden may properly be enjoined from serving as the Acting Commissioner of Commerce of the Virgin Islands, I reach that conclusion by a considerably different route. Thus I write separately not only because I am concerned about the majority's approach to adjudicating a conflict between the executive and legislative branches of the Virgin Islands, but also because I am persuaded that, on the merits, the majority has misapplied provisions of the Virgin Islands Code that are applicable to this case. Rather than rely on a questionable construction of the ambiguous language of 3 V.I.C. Sec. 64(a), I would hold more narrowly that under Secs. 64(b)(3) and (c) Mr. Golden could not legally serve as acting commissioner after the Senate had rejected his appointment as permanent commissioner. Insofar as the majority suggests that even a portion of Mr. Golden's tenure as acting commissioner was proper under the Code, I must respectfully dissent.
 
 I.
 
 82
 Before explaining his decision on the merits, the district judge in this case observed:
 
 
 83
 I might say at the outset [that this lawsuit] has all the earmarks and trappings of one of our not infrequent clashes between two of our coordinate branches of government, which, with a little discussion, some cooperation and a little give on each side, might be resolved without the intervention of the third coordinate branch.
 
 
 84
 But it appears that there is more willingness to litigate than to discuss, and so this case is here before the court.
 
 
 85
 Dennis v. Luis, Civ. No. 83-322, Tr. at 2 (D.V.I. Dec. 23, 1983); App. at 125. Having said that, however, the district judge announced his decision without discussing the advisability of a judicial resolution of the intrabranch dispute. Given the lack of guidance from our Court on the subject, the omission is not surprising.
 
 
 86
 Underlying the case law on the subject of legislator plaintiffs is a conviction embodied in the separation-of-powers doctrine: the vigorous functioning of democratic institutions is best served when political clashes are settled by political officials, and not by judges. Thus, the courts have attempted to articulate doctrines of justiciability to provide principled meaning to a strong presumption against judicial resolution of intrabranch disputes. Unfortunately, this philosophy of judicial restraint has sometimes been submerged in a debate over legal labels. Courts have sought to analyze the issue in terms of "legislator standing," "remedial discretion," "ripeness," and "political questions." But despite the controversy about the proper analytic categories, there is no disagreement about the core meaning of these doctrines: courts should not cut short the political process by awarding a judicial victory to a legislator who has lost, or has not attempted to prevail, in the political sphere.
 
 
 87
 As is shown by the experience of the District of Columbia Circuit with congressional plaintiffs, the fundamental problem is to develop workable legal criteria for exercising judicial restraint. Before the Supreme Court's decision in Goldwater v. Carter, 444 U.S. 996, 100 S.Ct. 533, 62 L.Ed.2d 428 (1979) (mem. op.), the District of Columbia Circuit treated the justiciability problem as a question of "legislator standing." In the mid-1970's, the Court of Appeals applied a rather pliable rule of legislator standing, permitting, for example, Senator Kennedy to challenge President Nixon's pocket veto of a health care bill, simply because the Senator sought to "vindicate the effectiveness of his vote." Kennedy v. Sampson, 511 F.2d 430, 436 (D.C.Cir.1974). By the late 1970's, however, the Court of Appeals had developed a stricter rule, grounded in the separation-of-powers doctrine. See Goldwater v. Carter, 617 F.2d 697, 702 (D.C.Cir.) (per curiam) (en banc), judgment vacated on other grounds, 444 U.S. 996, 100 S.Ct. 533, 62 L.Ed.2d 428 (1979); Harrington v. Bush, 553 F.2d 190 (D.C.Cir.1977). The en banc Goldwater Court provided the clearest pronouncement of the restrictive test for legislator standing:
 
 
 88
 To be cognizable for standing purposes, the alleged diminution in congressional influence must amount to a disenfranchisement, a complete nullification or withdrawal of a voting opportunity; and the plaintiff must point to an objective standard in the Constitution, statutes or congressional house rules, by which disenfranchisement can be shown.
 
 
 89
 617 F.2d at 702.
 
 
 90
 After the Supreme Court's decision in Goldwater, a panel of the District of Columbia Circuit developed a two-step approach to determine the justiciability of actions brought by congressional plaintiffs. In Riegle v. Federal Open Market Comm., 656 F.2d 873 (D.C.Cir.1981), the Court declared that the standing of congressional plaintiffs should be analyzed under traditional doctrines of private party standing. Relying on an article by Judge McGowan, Congressmen in Court, 15 Ga.L.Rev. 241 (1981), Riegle held that separation-of-powers problems should be dealt with through the exercise of the court's "remedial discretion." When legislator-plaintiffs have available "in house" or "collegial remedies" in the political process, courts should refrain from using their equitable powers lest they "improperly interfere with the legislative process."[1] Riegle, supra, 656 F.2d at 882.
 
 
 91
 In my view, the Riegle analysis would appear acceptable, as long as the en banc Goldwater criteria for legislator standing are incorporated in that analysis.[2] Keeping in mind that the essential point of these doctrines is to encourage political solutions to political problems, I believe a two-part test should be applied. First, to establish standing, legislator-plaintiffs must allege injury unique to their status as legislators by showing, in Goldwater's terms, "a complete nullification [of a past vote] or withdrawal of a voting opportunity." 617 F.2d at 702. Legislators who claim withdrawal of an opportunity to vote must show a clearly vested right to vote. But if they claim nullification of a past vote, they must distinguish their interest as legislators from the general interest of citizens in "governmental observance of the Constitution." Valley Forge Christian College v. Americans United for Separation of Church and State, 454 U.S. 464, 482, 102 S.Ct. 752, 763, 70 L.Ed.2d 700 (1982). The legislators may show, as in Coleman v. Miller, 307 U.S. 433, 59 S.Ct. 972, 83 L.Ed. 1385 (1939), that as an aggregate they constitute a controlling bloc of the legislative branch. In Coleman, the Kansas Senate had split evenly over ratification of a constitutional amendment, but the tie had been broken and the amendment approved because of the vote of the Lieutenant Governor. Suit was filed by the twenty senators who voted against ratification, and the Supreme Court held that the group had standing:
 
 
 92
 Here, the plaintiffs include twenty senators, whose votes against ratification have been overridden and virtually held for naught although if they are right in their contentions their votes would have been sufficient to defeat ratification. We think that these senators have a plain, direct and adequate interest in maintaining the effectiveness of their votes.
 
 
 93
 307 U.S. at 438, 59 S.Ct. at 975. As a bloc, the Coleman plaintiffs could identify an injury to the legislative branch. Their aggregate injury was therefore unlike the injury inflicted on all citizens when the law is violated, since it was grounded in their status as members of the state senate.
 
 
 94
 Once legislator-plaintiffs have properly alleged standing, they must show that judicial resolution of the dispute would not prematurely terminate the political process. This may be determined by pointing to "an objective standard in the Constitution, statutes or congressional house rules." Goldwater, supra, 617 F.2d at 702. When there is no such clearly established law, then usually either the political branches have failed to enact definite rules or the issue is committed to the discretion of the executive. Thus, if legislator plaintiffs are unable to point to clear law, they should be required to produce evidence that the political process has run its course.
 
 
 95
 Admittedly, this proposed two-step approach is not comprehensive. But it is at least a first step in supplying standards of restraint by which courts can encourage political resolutions of intrabranch disputes. Although the majority's approach may produce similar results, I am concerned by two sources of open-endedness in its analysis. First, the majority declines to adopt the Riegle doctrine of "remedial discretion;" yet it follows the Riegle Court's decision to employ conventional standing doctrine. This partial borrowing ignores the fact that the District of Columbia Circuit moved away from its more restrictive doctrine of legislator standing only because it decided to address separation-of-powers problems at the "remedial discretion" stage of the Riegle approach. Second, the majority gives no content to its view of how the separation-of-powers doctrine can be preserved in adjudicating intrabranch disputes. Instead, the majority simply distinguishes Riegle from the facts of the case before us. I fear that this approach will, in the future, leave district courts with little more guidance than has been provided in the present case.
 
 II.
 
 96
 Approaching this controversy with the caution informed by a concern for the separation-of-powers, I am persuaded that the claim made by the eight senators in the present case overcomes the strong presumption against judicial interference in an intrabranch dispute.
 
 
 97
 In a 1978 amendment to 3 V.I.C. Sec. 64, the legislature filled an important gap in the statute governing appointment of temporary commissioners:
 
 
 98
 Nothing in this section shall be interpreted to permit a recess appointee to serve in any capacity, other than an acting capacity, prior to his confirmation by the Legislature. No recess appointee may hire or dismiss personnel, significantly alter department or agency programs established prior to his appointment, or institute new programs prior to his confirmation by the Legislature.
 
 
 99
 3 V.I.C. Sec. 64(c) (as amended April 19, 1978, No. 4130, Sec. 1, Sess.L. 1978, p. 81).
 
 
 100
 This provision eliminated two critical deficiencies in the Virgin Islands Code. First, Sec. 64(c) makes clear that whether temporary commissioners are called "acting" commissioners or "recess" commissioners is not determinative; in either case, they are limited to the minimal role of caretaker for the department.[3] Second, Sec. 64(c) provides the Governor with a strong incentive to obtain confirmation of a permanent commissioner as soon as possible, for until then, the Governor is, because of the limits on an acting commissioner, frustrated in any effort to implement new departmental policy.
 
 
 101
 In light of Sec. 64(c), it becomes apparent that another provision--forbidding a recess appointment of a rejected nominee--squarely applies to the case before us. Under 3 V.I.C. Sec. 64(b)(3) (emphasis added):
 
 
 102
 No money shall be paid from the treasury of the Virgin Islands, as compensation, to any person appointed during the recess of the Legislature to fill a vacancy in an office which is required by law to be filled with the advice and consent of the Legislature if the vacancy existed while the Legislature was in session, until such appointee has been confirmed by the Legislature. The provisions of this subsection shall not apply if ... (3) a nomination for such office was rejected within ten days prior to the termination of the session and a person other than the one whose nomination was rejected thereafter receives a recess appointment.
 
 
 103
 Although this section of the Code is expressed in terms of compensation, it is nonetheless a substantive limitation on the appointment powers of the Governor. Thus, the convoluted structure of Sec. 64(b)(3) should not be permitted to obscure its relevance to Golden's situation: whatever else the Governor could do to fill the vacancy at the Commerce Department pending approval of a permanent commissioner, he could not fill that vacancy with a recess commissioner--or, as Sec. 64(c) shows, an acting commissioner--whose nomination had been rejected by the legislature.[4] Once rejected for a permanent appointment, Golden could not validly serve as head of the Commerce Department, unless his nomination had been duly confirmed upon resubmission of his name to the legislature.
 
 
 104
 Given the plain command of Secs. 64(b)(3) and (c), I believe that the legislator-plaintiffs in this case had standing and could rely on clearly established law. Because the plaintiffs are eight of the ten senators who voted against Golden's appointment, they constitute a controlling bloc in the same sense as the twenty senators in Coleman. As in Coleman, the senators in the case before us had votes "sufficient to defeat [the challenged action]"; thus their votes, as a bloc, were "held for naught." The senators could base standing on the withdrawal of a voting opportunity, since Golden's name had to be resubmitted to the legislature before he could validly head the Commerce Department in any capacity. Additionally, there can be no question that the political process had run its course, since Secs. 64(b)(3) and (c) provide an unambiguous rule governing this case. Finally, it is of crucial importance that the governor's appointee was precisely the individual rejected by the legislators. Thus this dispute is not an attempt to force the courts to intervene in a purely political controversy between coordinate branches of government, but rather involves an allegation that the constitutional authority of the legislature had been preempted.
 
 III.
 
 105
 The majority concludes, as do I, that Golden must be removed from office, but relies on a different statutory provision, namely 3 V.I.C. Sec. 64(a). This section requires that a recess appointment "shall expire at the end of the next session of the Legislature." Reasoning that the word "session" in Sec. 64(a) must include only "regular" sessions, and not the "special" sessions called by the Governor or the Senate President, the majority looks to the senate rules to determine when Golden's recess appointment expired.[5] Since Golden was appointed during a recess on November 22, 1983, and since the next regular legislative session commenced "on the second Monday in January," the majority concludes that Golden could no longer serve as the acting commissioner after the January session. The majority apparently assumes that the January session ends "four calendar weeks" after "the first Monday in March." In 1984, that day fell on April 2. The majority therefore seems to hold that Golden validly served as acting commissioner for the 4 1/2 month period from November 22, 1983 to April 2, 1984. I see three flaws in such an analysis. First, under the majority's theory, the plaintiffs in this case failed to state a claim until April 2, 1984. Thus, at all times prior to that date--when suit was filed on December 7, 1983, when the district court granted injunctive relief on December 23, 1983, and when argument took place before our Court on February 27, 1984--Golden was, according to the majority, acting legally as the Commissioner of Commerce. I have considerable doubt whether a court may, simply through the passage of time pending appellate disposition, salvage an otherwise inadequate claim.
 
 
 106
 Another shortcoming in the majority's analysis is its reliance on a broad construction of a highly ambiguous section of the Code, despite the ready basis for a narrow holding predicated on the plain meaning of another provision. The majority interprets the term "session" in Sec. 64(a) as including only "regular" sessions, not "special" ones. This conclusion rests solely on the conjecture that a different conclusion would produce "utter chaos" in the government of the Virgin Islands, Maj.Op. at 637, a matter about which we, as appellate judges operating primarily on the mainland, have little expertise. Having construed "session" to mean "regular session," the majority then concludes that the Senate Rules define "regular session" to mean any one of the four-week or six-week periods specified as times when a session "shall continue." As I read the Senate Rules, this language could just as sensibly be interpreted to mean that a "regular session" extends over a full year--as is the case in the United States Congress--beginning annually in January, with the Senate convening mandatorily during three specified periods. The majority's assumption that a "session" consists of some subpart of the year demarked by the Senate Rules is unnecessarily speculative because a more narrow holding, based on the clear command of Secs. 64(b)(3) and (c), is readily at hand.[6]
 
 
 107
 My final concern with the majority's analysis is jurisprudential. In the ordinary civil case, it may be appropriate for a court to engage in the interstitial interpretation necessary to give meaning to language as ambiguous as that of Sec. 64(a). See generally, Frankfurter, Some Reflections on the Reading of Statutes, 47 Colum.L.Rev. 527 (1947). But this case does not arise out of a clash between two private parties, or between a private party and the government. Rather, it involves a political struggle between the executive and legislative branches. When courts deal with the delicate working relationship between two coordinate branches, they should hesitate before devising solutions that may alter the balance of political power. I fear that the majority's solution to the ambiguities of Sec. 64(a) will establish an unfortunate precedent for future clashes between the Governor and the Senate of the Virgin Islands.[7] Were we forced to rely on Sec. 64(a) to resolve this case, I would contend that the law is unclear and that the legislators must come forward with evidence of an attempted political solution before invoking the aid of the courts. Thus, I join in the conclusion that judicial relief is appropriate in this case not because of the open-ended language of Sec. 64(a), but because the political branches have already defined a clear rule in the terms of Secs. 64(b)(3) and (c).
 
 IV.
 
 108
 The majority has proposed a solution to one of the lacunae in the provisions of the Virgin Islands Code governing appointment of departmental commissioners. Were I a member of the Virgin Islands Senate, I might possibly consider voting in favor of such a proposal. But as members of the federal bench, our role is obviously quite different from that of the legislative branch. Most importantly, respect for the separation-of-powers doctrine counsels against judicial intervention in disputes between the legislative and the executive branches, unless the legislators seeking judicial redress have alleged injury peculiar to their status as legislators and have shown that methods of political resolution have run their course. Here, I believe, the political branches have spoken clearly and have by statute prohibited a rejected nominee, such as Golden, from serving as a caretaker commissioner, no matter what title is used for his position. Accordingly, I join the result reached by the majority insofar as it affirms the district court's order enjoining Golden from further service as Acting Commissioner of Commerce. But to the extent that the majority holds that Golden could properly serve as acting commissioner following the rejection of his nomination, I must respectfully dissent.
 
 
 
 [1]
 See Riegle v. Federal Open Market Committee, 656 F.2d 873 (D.C.Cir.), cert. denied, 454 U.S. 1082, 102 S.Ct. 636, 70 L.Ed.2d 616 (1981)
 
 
 [2]
 Appellants also move this court to strike a portion of footnote 4 of appellees' brief which asserts that:
 The Fifteenth Legislature is clearly divided into two factions 9 to 6. No Senator of the six has to date seen fit to vote with the other 9 on any matter where a 10th vote was needed, including such important matters as budget for 1984. The enactment of any statutory remedy concerning this matter will most definitely be vetoed by the Governor. A 10th vote to override the veto is almost certainly impossible. Therefore, there is no legislative remedy available to plaintiffs in this matter even if legislation could remedy the complained of action.
 Because the appellees have failed to provide factual support for these statements, we will grant appellants' motion to strike the challenged portion of appellees' brief.
 
 
 [3]
 During oral argument counsel for the legislators questioned whether the traditional concept of standing is applicable here given the hybrid nature of the United States District Court of the Virgin Islands. The Virgin Islands District Court has a dual role. It sits both as a traditional state court adjudicating purely local and non-federal issues and as a traditional United States District Court adjudicating purely local and non-federal issues and as a traditional United States District Court adjudicating solely issues of federal law. See Revised Organic Act of 1954, Sec. 22, 48 U.S.C. Sec. 1612. For purposes of this appeal, we find this a distinction without substance concerning the issue of standing
 
 
 [4]
 In some instances, Congressmen as plaintiffs in suits against the executive branch have been successful in obtaining standing and in receiving judicial relief. See Kennedy v. Sampson, 511 F.2d 430 (D.C.Cir.1974); Goldwater v. Carter, 617 F.2d 697 (D.C.Cir.) (en banc) (per curiam), vacated, 444 U.S. 996, 100 S.Ct. 533, 62 L.Ed.2d 428 (1979); American Federation of Government Employees v. Pierce, 697 F.2d 303 (D.C.Cir.1982) (per curiam)
 In other instances, however, courts have held that Congressmen did not have standing to litigate their complaints. See Public Citizen v. Sampson, 379 F.Supp. 662 (D.D.C.1974); aff'd mem., 515 F.2d 1018 (D.C.Cir.1975); Harrington v. Bush, 553 F.2d 190 (D.C.Cir.1977); Reuss v. Balles, 584 F.2d 461 (D.C.Cir.), cert. denied, 439 U.S. 997, 99 S.Ct. 598, 58 L.Ed.2d 670 (1978).
 
 
 [5]
 Riegle's complaint would have been solved if his colleagues had amended 12 U.S.C. Sec. 263(a) "to require that the five Reserve Bank members of the FOMC be appointed with the advice and consent of the Senate pursuant to the Appointments clause. United States Constitution, article II, sec. 2, cl. 2." Riegle, 656 F.2d at 876
 
 
 [1]
 Judges Bork and Scalia have expressed vigorous opposition to Riegle's two-step analysis. See Crockett v. Reagan, 720 F.2d 1355, 1357 (D.C.Cir.1983) (Bork, J., concurring); Van Der Jagt v. O'Neill, 699 F.2d 1166, 1177-85 (D.C.Cir.1982) (Bork, J., concurring); Moore v. U.S., 723 F.2d 946 (D.C.Cir.1984) (Scalia, J., concurring). They contend that the justiciability of a legislator's lawsuit turns on the power of the court to hear the case under Article III of the Constitution and must therefore be addressed in terms of the mandatory rules of the standing doctrine, rather than the discretionary rules of equitable restraint
 
 
 [2]
 The views expressed by a majority of the Justices in the Supreme Court's Goldwater decision are not inconsistent with the Court of Appeals criteria. Both Justice Powell's theory that the case would not be "ripe" until political avenues of redress had been exhausted. 444 U.S. at 997-98, 100 S.Ct. at 533-534 and Justice Rehnquist's theory (joined by Chief Justice Burger, and Justices Stewart and Stevens) that the case involved a "nonjusticiable political question," 444 U.S. at 1002-04, 100 S.Ct. at 536-537, focus on the same concerns identified somewhat more precisely by the District of Columbia Circuit
 
 
 [3]
 Thus, even assuming that Golden was properly appointed as acting commissioner, he appears to have been performing functions outside the proper scope of his authority under Sec. 64(c). The district court twice noted the Governor's concession that Golden was performing all the duties of the Commissioner of Commerce. Dennis, supra, Tr. at 6, 14; App. at 129, 137
 
 
 [4]
 Although Sec. 64(b) speaks in terms of money being paid from the treasury, rather than general legality of a recess appointment such as Golden's, I do not think the drafters of the provision intended to suggest that a rejected nominee should continue to serve as a recess appointee as long as he is willing to work without pay
 
 
 [5]
 The Rules of the Senate for the Virgin Islands Fifteenth Legislature, Chapter 2, Section 201(a)
 
 
 [6]
 In his oral opinion, the district judge expressly relied on Sec. 64(b)(3) as an alternative basis for his decision. See Dennis, supra, Tr. at 12, 15; App. at 135, 138. The majority does not explain why it has not employed the district court's alternative rationale
 
 
 [7]
 Thus I believe that the majority overlooks the open-endedness of Sec. 64(a) when it asks: "Should legislators be able to use the court to implement a victory that was won in the legislative hall and ignored in the executive mansion"? Maj. Op. at 632. This question assumes the existence of clearly established laws