**SENATOR RONALD E. RUSSELL, ESQ., Plaintiff**
**v.**
**GOVERNOR JOHN P. DeJONGH,[1] Defendant**

Civil No. 2006-228

District Court of the Virgin Islands

Division of St. Thomas and St. John

January 4, 2007

---

[1]    The original caption listed Governor Charles W. Turnbull as the defendant. On January 1, 2007, John P. DeJongh was sworn-in as Governor of the Virgin Islands. At a January 3, 2007, hearing, the Court ordered the substitution of Governor DeJongh as the defendant as required by Federal Rule of Civil Procedure 25.

674

ROYETTE W. RUSSELL, The Russell Law Firm, LLP, Kingshill, VI, *For Senator Ronald E. Russell, Esq., Plaintiff.*

GOMEZ, *Chief Judge*

## MEMORANDUM OPINION

(January 4, 2007)

Senator Ronald E. Russell ("Russell") has filed suit against Governor Charles W. Turnbull (the "Governor" or "Governor Turnbull").

## I. FACTS

On September 30, 2004, the Virgin Islands Legislature passed Bill No. 25-0213 to establish the Supreme Court of the Virgin Islands pursuant to section 21(a) of the Revised Organic Act. Governor Turnbull approved the bill on October 29, 2004, as Act No. 6687. The first line of Act 6687 reads "To amend title 4, Virgin Islands Code to establish the Supreme Court of the Virgin Islands and ... for other purposes." Specifically, Act 6687 provided:

SECTION 2. Title 4 Virgin Islands Code is amended by adding Chapter 2 to read as follows:

(a) The Governor shall appoint, with the advice and consent of the Legislature, three justices and subject to the advice and consent of the Legislature, appoint a qualified person to fill any vacancy occurring in the office of justice in the Supreme Court.

....

(c) The Governor may not send a nomination for a justice of the Supreme Court to the Legislature for confirmation without having given seven days' public notice in a newspaper of general circulation designated pursuant to section 251(a) of title 31, of this Code.

...

SECTION 3.

(a) [T]he Governor shall submit nominations for the associate justices of the Supreme Court to the Legislature within ninety days after the effective date of any act appropriating monies to fund the operations of the Supreme Court and shall at the time of submission designate one of the justices to serve an initial term of four years as the initial Chief Justice of the Supreme Court.

...

Act No. 6687. It also provided that the Supreme Court would have regular sessions on Charlotte Amalie, St. Thomas.

In February, 2005, the Twenty-Sixth Legislature of the Virgin Islands (the "Legislature") passed Bill No. 26-0003. Section 61 of Bill No. 26-0003 amended 4 V.I.C. § 21(b)(2) to provide that the Supreme Court would have regular sessions on St. Croix. Governor Charles Turnbull (the "Governor" or "Governor Turnbull") vetoed section 61 of Bill No. 26-0003. The Legislature overrode the veto, enacting the bill[2] as Act No. 6730 thereby requiring the Supreme Court to hold regular sessions on St. Croix. See 4 V.I.C. 21(b)(2).

On September 18, 2005, the Legislature passed Bill No. 260083, which stated the following:

> SECTION 2. The Virgin Islands Public Finance Authority shall make available, forthwith, to the Superior Court of the Virgin Islands the sum of 5.75 million dollars to construct and establish the Virgin Islands Supreme Court on St. Croix.

The Governor vetoed the bill on December 2, 2005. On December 15, 2005, the Legislature overrode the veto enacting Bill 26-0083 as Act No. 6816.

On July 19, 2006, Governor Turnbull nominated Judges Maria M. Cabret, Ive A. Swan and Rhys S. Hodge to serve as justices on the Supreme Court. On October 24, 2006, the Governor called the Twenty-Sixth Legislature into a special session to be held on October 27, 2006, in which he requested the Legislature to consider the nominees.[3]

According to Russell, "[d]espite protestations and the request for legal counsel's assistance, on October 27, 2006, after a motion to re-send the nominees to the Rules and Judiciary Committee, the Legislature convened and purportedly confirmed the three nominees." [Compl. at 8.]

---

[2]     Section 9 of the Revised Organic Act explains that if the Governor vetoes a bill, the legislature may reconsider the bill upon motion by a legislator and "[i]f, after such reconsideration, two-thirds of all the members of the legislature pass the bill, it shall be a law."

[3]     Section 7 of the Revised Organic Act provides:

[t]he Governor may call special sessions of the legislature at any time when in his opinion the public interest may require it. No legislation shall be considered at any special session other than that specified in the call therefor or in any special message by the Governor to the legislature while in such session.

There are no further details regarding the protestations. The roll-call vote results indicated the confirmations were all unanimous. [Compl. Ex 13.]

Also on October 27, 2006, the Legislature passed Bill No. 26-0338 which, in sum, provides that because the Public Finance Authority did not have $5,750,000 available

> [t]here is appropriated from the General Fund in the fiscal year ending September 30, 2007, the sum of $ 5,750,000, to the Superior Court of the Virgin Islands for the establishment and construction of the Supreme Court of the Virgin Islands on the island of St. Croix. The sum remains available until expended.

Bill No. 26-0338. The Governor approved the bill, noting he only signed it because he did not intend to impede the establishment of the Supreme Court. [Letter from Charles E. Turnbull, Governor of the Virgin Islands, to Lorraine L. Berry, President of the Legislature (Nov. 22, 2006) (Ex. G).]

On December 15, 2006, Russell filed a complaint in the District Court against the Governor seeking declaratory relief. In Count One, Russell seeks a declaration from this Court that the nominations were null and void. Russell alleges the Supreme Court nominations were untimely. Russell asserts that more than six months passed between the legislation's enactment on December 15, 2005, and Governor Turnbull's nominations of the justices on July 19, 2006. Russell argues that the nominations were thus procedurally flawed.

In Count Two, Russell seeks a declaration from this Court that the Governor's actions in calling a special session to consider the nominations was a violation of the doctrine of separation of powers.

On December 15, 2006, Russell filed a motion for a temporary restraining order to enjoin the swearing-in of the Supreme Court justices.

On December 17, 2006, the Governor filed a motion to dismiss. The Governor argues that this Court lacks jurisdiction based on the doctrine of unclean hands. He also argues the Court lacks jurisdiction because Russell failed to join an indispensable party and that Russell sued the wrong party.

Russell withdrew his motion for a temporary restraining order on December 17, 2006, after all parties agreed that "[t]he withdrawal of the TRO application of the plaintiff is without prejudice to the positions of the parties on the merits of the plaintiff's claims or the contentions of the

defendant or the relief sought." The Supreme Court Justices were sworn into office on December 18, 2006.

On December 20, 2006, the Court ordered the parties to submit briefs "indicating what authority exists for a claim of a separation of powers violation, as well as any authority indicating the appropriate litigant to bring such a claim and under what circumstances such a claim may be raised ... ." In response to the order, both parties provided briefs, and the Governor filed a motion for summary judgment. Russell filed a motion in support of declaratory judgment.

## II. Standing

■ This Court has an obligation to satisfy itself of its own jurisdiction. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 95, 118 S. Ct. 1003, 140 L. Ed. 2d 210 (1998) (explaining that even if parties concede jurisdiction, federal appellate courts still have an obligation to ensure that they have jurisdiction). In order for a party to obtain relief in this Court, that party must have standing. *Bartley v. Virgin Grand Villas*, 197 F. Supp. 2d 291, 293, n.2 (D.V.I. 2002). To establish standing, "[a] plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Allen v. Wright*, 468 U.S. 737, 751, 104 S. Ct. 3315, 82 L. Ed. 2d 556 (1984).

The Supreme Court has "always insisted on strict compliance with this jurisdictional standing requirement. And [the Court's] standing inquiry has been especially rigorous when reaching the merits of the dispute would force [it] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." *Raines v. Byrd*, 521 U.S. 811, 819-20, 117 S. Ct. 2312, 138 L. Ed. 2d 849 (1997).

To determine whether Russell is the appropriate plaintiff to bring the charges in the complaint, the Court must first examine and determine what, if any, legally cognizable causes of action are alleged.

## III. Russell's Claims

### A. Untimely Nominations

The first cause of action alleged in Russell's complaint is that the Governor failed to timely nominate the justices within the time set by

Act 6687, Section 3(a). The Court first must interpret Act 6687 to determine whether it creates a private cause of action. When interpreting a statute, the Court first looks to the language within the four corners of the statute. *See Rubin v. United States*, 449 U.S. 424, 430, 101 S. Ct. 698, 66 L. Ed. 2d 633 (1981) ("When we find the terms of a statute unambiguous, judicial inquiry is complete, except in rare and exceptional circumstances." (internal quotations omitted)); *see also Gov't of the V.I. v. Knight*, 989 F.2d 619, 633, 28 V.I. 249 (3d Cir. 1993) ("[I]f the statutory language is clear, a court must give it effect unless this 'will produce a result demonstrably at odds with the intention of [the] drafters.'" (quoting *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 570, 102 S. Ct. 3245, 73 L. Ed. 2d 973 (1982))). Only where the text of the statute is unclear will the Court go beyond the four corners of the document. *Alexander v. Sandoval*, 532 U.S. 275, 288, 121 S. Ct. 1511, 149 L. Ed. 2d 517 (2001) (noting that because the Court was construing an unambiguous act, it could begin and end its search for Congressional intent with the text and structure of the act).

An exhaustive review of Act 6687 establishes that it does not explicitly create a private cause of action for the Governor's failure to timely nominate justices. Nor does Act 6687 provide any other private remedies.[4] Even so, this Court's inquiry regarding a private cause of action is not yet complete.

■ When a statute does not expressly provide for a private cause of action, courts examine the statute to determine whether a cause of action

---

[4]    During a January 3, 2007, hearing, the Court inquired about the existence of a private cause of action in Act 6687:

THE COURT: [T]he cause of action that's alleged is not explicitly recognized in the act, that is 6687, nor is it explicitly recognized in 6900.

MR. RUSSELL: Right.

THE COURT: So the Court would have to turn to the common law, it would seem, and so I ask you, what is it in the common law or maybe there's some other statute that creates this cause of action . . . .

MR. RUSSELL: [B]ecause the legislature in its haste to pass the legislation, which was the Supreme Court legislation and certain things were left out which may have been a cause of action on remedy, the issue then becomes maybe there is no remedy right now by that statute ... . It was not envisioned by the legislature, Judge, that this governor would not follow the law.

[Hr'g Tr. 64-66, Jan. 3, 2007.]

is implied in that statute. *Cort v. Ash*, 422 U.S. 66, 78, 95 S. Ct. 2080, 45 L. Ed. 2d 26 (1975); *see also Miller v. V.I. Hous. Auth.*, Civil No. 1998-0089, 2005 U.S. Dist. LEXIS 11146 at *12, 15, 46 V.I. 623 (D.V.I. June 3, 2005) (using three of the *Cort* factors to determine that the Virgin Islands anti-discrimination statute did not have a private cause of action for discrimination based on age or sex); *Monsanto v. V.I. Hous. Auth.*, 18 V.I. 113, 120 (Terr. Ct. 1982) (using the *Cort* factors to determine that no private cause of action was implied in the Virgin Islands Sunshine Act).

■ In *Cort v. Ash*, the United States Supreme Court established a four-prong test to determine "whether a private remedy is implicit in a statute not expressly providing one. ..." 422 U.S. at 78. Under the *Cort* test, a private cause of action may only be inferred if: (1) the plaintiff is "one of the class for whose especial benefit the statute was enacted," (2) there is some "indication of legislative intent, explicit or implicit, ... to create such a remedy", (3) implying a remedy for the plaintiff would be "consistent with the underlying purposes of the legislative scheme", and (4) "the cause of action [is not] one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law." *Id.* (internal citations and quotations omitted).

The first two factors are most critical. The third and fourth factors "are only of relevance if the first two factors give indication of congressional intent to create the remedy." *California v. Sierra Club*, 451 U.S. 287, 298, 101 S. Ct. 1775, 68 L. Ed. 2d 101 (1981).

■ Under *Cort*, the initial consideration is whether the plaintiff is a member of a class for whose special benefit the statute was enacted. 422 U.S. at 78. Act 6687 benefits the public at large by establishing a Supreme Court of the Virgin Islands. There is no particular class for whose special benefit this Act was enacted. *See, e.g., Sierra Club*, 451 U.S. at 298 (declining to find implied private cause of action when Act was not "intended to create federal rights for the especial benefit of a class of persons but rather that it was intended to benefit the public at large"). Thus, the first *Cort* factor weighs against finding any implied private right of action in Act 6687. *See, e.g., Alexander*, 532 U.S. at 289 ("Statutes that focus on the person regulated rather than the individuals protected create 'no implication of an intent to confer rights on a particular class of persons.'" (quoting *Sierra Club*, 451 U.S. at 294)); *see also Monsanto*, 18 V.I. at 122 ("Absent some express intent to create a

private cause of action and given the fact that the purpose of the [Virgin Islands Sunshine] Act was to benefit the general public as a whole, and, indirectly, the press, as opposed to an individual citizen, the court believes it would be engaging in judicial legislation to hold that such a right was created by the [Virgin Islands Sunshine] Act.").

The second factor requires some indication of legislative intent to create a private remedy. "In determining whether statutes create private rights of action, as in interpreting statutes generally, legal context matters only to the extent it clarifies text." *Alexander*, 532 U.S. at 288 (citing *Blatchford v. Native Village of Noatak*, 501 U.S. 775, 784, 111 S. Ct. 2578, 115 L. Ed. 2d 686 (1991)).

■ There is nothing ambiguous about Act 6687. The text of Act 6687 sets forth all of the particulars to create a Supreme Court of the Virgin Islands. It establishes the structure of the court, the nomination and appointment procedures, methods for selecting the chief justice. It provides the terms of the offices as well as the means for the appointment of other judges to sit as designated justices. Act 6687 also provides for removal and retirement of justices and the compensation structure. The Court finds that the clear and indisputable purpose of Act 6687 is "to establish the Supreme Court of the Virgin Islands," as indicated in the Act's caption. The language and structure of Act 6687 do not imply a private remedy.[5]

In essence, Count One of Russell's complaint invites this court to recognize a cause of action that was not contemplated by the Legislature. The Court will decline that invitation. Because Count One presents no legally cognizable claim, it will be dismissed.

## B. Separation of Powers Claim

In Russell's second count, he alleges a violation of separation of powers doctrine. Specifically, Russell states that a Governor does not have the authority "to call a special legislative session to force the

---

[5]    As the first two factors give no indication of legislative intent to create a private remedy, the Court need not examine the other *Cort* factors. *California v. Sierra Club*, 451 U.S. 287, 298, 101 S. Ct. 1775, 68 L. Ed. 2d 101 (1981) (noting the third and fourth factors "are only of relevance if the first two factors give indication of congressional intent to create the remedy").

legislature to consider nominations that are before the legislature for advice and consent." [Compl. at 11.]

Courts have recognized a cause of action for separation of powers violations under the common law. *See, e.g., Clinton v. City of New York,* 524 U.S. 417, 118 S. Ct. 2091, 141 L. Ed. 2d 393 (1998) (discussed below); *Grisham v. United States,* 1997 U.S. App. LEXIS 12788 (5th Cir. 1997) (addressing the merits of plaintiff's claim that an act violated the separation of powers doctrine); *Apache Survival Coalition v. United States,* 21 F.3d 895, 901 (9th Cir. 1994) (addressing whether an act violated the separation of powers doctrine when a plaintiff non-profit organization sued to halt construction of telescopes on top of a mountain). Where, as here, a plaintiff has alleged a claim that may be recognized by a court, judicial review is not necessarily mandatory. Indeed, in order to obtain judicial review of such an action, the plaintiff must have standing.

"To meet the standing requirements of Article III, a plaintiff must allege *personal injury* fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Raines,* 521 U.S. at 818 (quoting *Allen v. Wright,* 468 U.S. 737, 751, 104 S. Ct. 3315, 82 L. Ed. 2d 556 (1984)) (emphasis added). An alleged violation of the Constitution, without more, does not establish Article III standing. *See Valley Forge Christian College v. Americans United for Separation of Church & State,* 454 U.S. 464, 485, 102 S. Ct. 752, 70 L. Ed. 2d 700 (1982) (discussed below). In *Clinton v. City of New York,* the Supreme Court addressed the general standing requirements for a separation of powers cause of action. The *Clinton* Court held that plaintiffs who claimed the Line Item Veto Act violated the separation of powers doctrine had standing to sue the President, among other defendants, when they had asserted a personal injury. 524 U.S. at 427. The Line Item Veto Act gave the President "authority to 'cancel' certain spending and tax benefit measures after he has signed them into law." *Raines,* 521 U.S. at 814. The plaintiffs included a farmers' co-operative with specific plans to take advantage of an amendment to the capital gains tax that would aid farmers' cooperatives in purchasing processing facilities. *Clinton,* 524 U.S. at 427. The taxpayer relief act passed, but the president used the Line Item Veto Act to veto that portion regarding farmers. The Court found that the farmers' prospective economic losses from purchasing facilities without the tax benefit was a sufficient

"personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Id.* at 430 n.15, 432. The *sine qua non* of standing is the existence of such a personal injury fairly traceable to the defendant's conduct.

Russell's complaint states "Senator Ronald E. Russell, Esq., is a citizen of the United States, resident of ... St. Croix, a taxpayer and at all times mentioned was and is an elected representative of the people of St. Croix and the Territory of the Virgin Islands as a Senator in the [Twenty-Sixth] Legislature." [Compl. at 2.] Further, the caption on his complaint lists the plaintiff as "Senator Ronald E. Russell, Esq." The language of Russell's complaint arguably implicates his status as a taxpayer, a citizen, and a legislator. Russell does not identify the specific position he occupies as a claimant in this action. Accordingly, the Court will review the standing requirements that must be considered when presented with a claimant in each of those capacities.

### 1. Taxpayer Standing

Taxpayers must allege a personalized injury to demonstrate standing when they sue for a separation of powers claim. In *Valley Forge Christian College v. Americans United for Separation of Church & State,* the plaintiffs, Americans United for Separation of Church and State ("Americans United"), sued when the Department of Health, Education and Welfare conveyed surplus property to Valley Forge Christian College. Americans United alleged that their taxpayer members "would be deprived of the fair and constitutional use of his (her) tax dollar for constitutional purposes in violation of his (her) rights under the First Amendment. ..." 454 U.S. at 469. The Supreme Court denied standing finding the plaintiffs had not "alleged an injury of any kind, economic, or otherwise, sufficient to confer standing." *Id.* at 486.

> Although respondents claim that the Constitution has been violated, they claim nothing else. They fail to identify any personal injury suffered by them as a consequence of the alleged constitutional error, other than the psychological consequence presumably produced by observation of conduct with which one disagrees. That is not an injury sufficient to confer standing under Art[icle] III. ...

*Id.* at 485.

684

Federal taxpayer standing is used when a plaintiff sues to challenge Congressional expenditures. *See Flast v. Cohen*, 392 U.S. 83, 88 S. Ct. 1942, 20 L. Ed. 2d 947 (1968). Under *Flast*, "a taxpayer will have standing consistent with Article III to invoke federal judicial power when he alleges that congressional action under the taxing and spending clause is in derogation of [the Establishment Clause]. ..." *Id.* at 105-106 (quoted in *DaimlerChrysler Corp. v. Cuno*, 126 S. Ct. 1854, 1864, 164 L. Ed. 2d 589 (2006)). "*Flast* held out the possibility that 'other specific [Constitutional] limitations' on Art. I, § 8, might surmount the 'barrier to suits against Acts of Congress brought by individuals who can assert only the interest of federal taxpayers.'" *DaimlerChrysler Corp.*, 126 S. Ct. at 1864 (quoting *Flast*, 392 U.S. at 105). However, case law demonstrates that "only the Establishment Clause has supported federal taxpayer suits since *Flast.*" *Id.*

■ Because Russell is not suing regarding an expenditure by Congress in violation of the Establishment Clause, Russell has no taxpayer standing. *See Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 228, 94 S. Ct. 2925, 41 L. Ed. 2d 706 (1974) (denying standing because "respondents did not challenge an enactment under Art. I, § 8, but rather the action of the Executive Branch"). Additionally, "state taxpayers have no standing under Article III to challenge state tax or spending decisions simply by virtue of their status as taxpayers." *DaimlerChrysler Corp.*, 126 S. Ct. at 1864.

In contrast to federal law, Virgin Islands law provides that, "[a] taxpayer may maintain an action to restrain illegal or unauthorized acts by a territorial officer or employee, or the wrongful disbursement of territorial funds." 5 V.I.C. § 80. Title 5, section 80 does not require a plaintiff to demonstrate a particularized injury. *Bryan v. Turnbull*, 291 F. Supp. 2d 386, 389 (D.V.I. 2003). Yet, as this Court has previously held, "Title 5 V.I.C. § 80 cannot be relied upon to establish standing in this Court because '[i]n a federal trial court ... standing to sue is determined by federal law.'" *Id.* (denying standing to taxpayers who did "not claim to have suffered or been threatened with any direct and individual injury not shared by all taxpayers in the territory"). Russell does not have standing as a taxpayer.

## 2. Citizen Standing

Russell's complaint also implicates his standing as a general citizen. Plaintiffs who sue as "citizens" must also assert a particularized injury to have standing to obtain relief in federal courts. In *Schlesinger v. Reservists Comm. to Stop the War,* the plaintiffs, the Reservists Committee to Stop the War, challenged the Armed Forces Reserve membership of certain members of Congress as a Incompatibility Clause. violation of the 418 U.S. at 210-11. The plaintiffs alleged that they "suffered injury because Members of Congress holding a Reserve position in the Executive Branch were said to be subject to the possibility of undue influence by the Executive Branch, in violation of the concept of the independence of Congress implicit in Art. I of the Constitution." *Id.* at 212 (footnote omitted). The issue before the Supreme Court was whether plaintiffs had standing as either taxpayers or citizens. The plaintiffs had sought to sue on behalf of all citizens and all taxpayers. The *Schlesinger* Court found the plaintiffs lacked standing as citizens,[6] finding that the plaintiffs alleged merely a generalized injury and were asking the court to resolve an abstract question. *Id.* at 222-23. The Court held

> [S]tanding to sue may not be predicated upon an interest of the kind alleged here which is held in common by all members of the public, because of the necessarily abstract nature of the injury all citizens share. Concrete injury, whether actual or threatened, is that indispensable element of a dispute which serves in part to cast it in a form traditionally capable of judicial resolution. It adds the essential dimension of specificity to the dispute by requiring that the complaining party have suffered a particular injury caused by the action challenged as unlawful.

*Id.* at 220-21. The Court noted the plaintiffs asserted only an "abstract injury in nonobservance of the Constitution." *Id.* at 223 n.13.

> All citizens, of course, share equally an interest in the independence of each branch of Government. In some fashion, every provision of the constitution was meant to serve the interests of all. Such a

---

[6] The *Schlesinger* Court affirmed the district court's denial of standing as taxpayers applying the *Flast* test with little discussion.

generalized interest, however, is too abstract to constitute a "case or controversy" appropriate for judicial resolution. The proposition that all constitutional provisions are enforceable by any citizen simply because citizens are the ultimate beneficiaries of those provisions has no boundaries.

*Id.* at 226-27 (footnote omitted).

"[T]o satisfy the Art[icle] III prerequisite the complaining party would still be required to allege a specific invasion of the right suffered by him. Standing could not be found -- as it is not here -- in a citizen who alleged no more than the right of all other citizens to have government conducted without what he perceived, without himself having suffered concrete harm, to be proscribed conflicts of interest." *Schlesinger*, 418 U.S. at 224 n.14; *see also Valley Forge*, 454 U.S. at 475 ("[T]he Court has refrained from adjudicating abstract questions of wide public significance which amount to generalized grievances, pervasively shared and most appropriately addressed in the representative branches." (internal quotations omitted)); *Julien v. Gov't of the V.I.*, 961 F. Supp. 852, 36 V.I. 165 (D.V.I. App. Div. 1997) (holding plaintiff lacked standing to sue "to enjoin, and declare void, any nomination or confirmation of members to the Casino Control Commission" when the Governor failed to provide public notice of a vacancy because, though plaintiff alleged during a hearing he would have applied for the position, plaintiff's harm was shared by the general public).

█ Russell has not asserted that he has suffered a personal injury. He seems to simply assert that the Governor has violated the separation of powers—a doctrine which benefits all citizens equally. "[A]ssertion of a right to a particular kind of Government conduct, which the Government has violated by acting differently, cannot alone satisfy the requirements of Art[icle] III ... ." *Valley Forge*, 454 U.S. at 483; *see also Schlesinger*, 418 U.S. at 227 ("The assumption that if respondents have no standing to sue, no one would have standing, is not a reason to find standing.").

If Russell simply claims harm to his interest in having the Governor abide by Act 6687, this harm "would be shared to the same extent by the public at large and thus provide no basis for suit." *Raines*, 521 U.S. at 832 (Souter, J., concurring) (citing *Valley Forge*, 454 U.S. at 482-83; *Schlesinger*, 418 U.S. at 217, 220; and *Fairchild v. Hughes*, 258 U.S.

126, 129-30, 42 S. Ct. 274, 66 L. Ed. 499 (1922)). Russell lacks citizen standing.

### 3. Legislator Standing

Finally, Russell's claim implicates his standing as a legislator. In *Raines v. Baird,* the Supreme Court had the opportunity to address the standing of individual legislators. In that case, six members of Congress (the "Congressmen") sued the Secretary of the Treasury and the Director of the Office of Management and Budget alleging that the Line Item Veto Act (the "Act") was an unconstitutional violation of the separation of powers doctrine. 521 U.S. at 811. The Congressmen had previously voted against the passage of the Act. *Id.* at 814.

> Specifically, they alleged that the Act "unconstitutionally expands the President's power," and "violates the requirements of bicameral passage and presentment by granting to the President, acting alone, the authority to 'cancel' and thus repeal provisions of federal law." They alleged that the Act injured them "directly and concretely ... in their official capacities" in three ways:

> "The Act ... (a) alters the legal and practical effect of all votes they may cast on bills containing such separately vetoable items, (b) divests the [appellees] of their constitutional role in the repeal of legislation, and (c) alters the constitutional balance of powers between the Legislative and Executive Branches, both with respect to measures containing separately vetoable items and with respect to other matters coming before Congress."

*Id.* at 816 (quoting the complaint). The Court explained the Congressmen had not alleged an appropriate injury to have personal standing noting

> Their claim is that the Act causes a type of institutional injury (the diminution of legislative power), which necessarily damages all Members of Congress and both Houses of Congress equally. Second, appellees do not claim that they have been deprived of something to which they personally are entitled. ... Rather, appellees' claim of standing is based on a loss of political power, not loss of any private right, which would make the injury more concrete.

*Id.* at 821. The Supreme Court also noted that the only time it upheld standing for legislators claiming an institutional injury was in *Coleman v. Miller. Id.* at 821.

The *Coleman v. Miller* Court granted standing to a group of twenty-one state senators from Kansas who filed a petition for a writ of mandamus. 307 U.S. 433, 59 S. Ct. 972, 83 L. Ed. 1385 (1939). Congress had proposed the Child Labor Amendment to the Constitution in 1924, and in 1925, the Kansas legislature adopted a resolution rejecting the amendment. *Id.* at 435. In 1937, a resolution ratifying the amendment was introduced into the Senate of Kansas. *Id.* at 436. Twenty senators voted against it and twenty voted for it. The Lieutenant Governor then voted in favor of the resolution, as the presiding officer of the state senate. *Id.* Twenty-one senators, including the twenty who voted against the resolution challenged the Lieutenant Governor's authority to cast the deciding vote and pointed to the prior rejection of the amendment, alleging that the proposed amendment lost its vitality due to the failure of the amendment to pass within a reasonable time. *Id.* The senators filed a petition for a writ of mandamus to restrain the Kansas Secretary of State from authenticating the resolution and delivering it to the Governor. *Id.* The Supreme Court granted standing to the senators explaining their "votes against ratification have been overridden and virtually held for naught although if they are right in their contentions their votes would have been sufficient to defeat ratification." *Id.* at 438.

The *Raines* Court distinguished *Coleman* explaining that Coleman stood for the notion that "legislators whose votes would have been sufficient to defeat (or enact) a specific legislative act have standing to sue if that legislative action goes into effect (or does not go into effect), on the ground that [the legislators] votes have been completely nullified." 521 U.S. at 823. The *Raines* Court explained that it "attach[ed] some importance to the fact that appellees have not been authorized to represent their respective Houses of Congress in this action, and indeed both Houses actively oppose their suit." *Id.* at 829.[7]

---

7    Indeed, the *Raines* Court noted

The two houses of Congress are legislative bodies representing larger constituencies. *Power is not vested in any one individual,* but in the aggregate of the members who compose the body, and its action is not the action of any separate member or number of members, but the action of the body as a whole.

The standing of legislators and the justiciability of such cases was also addressed in *Dennis v. Luis*, 741 F.2d 628 (3d Cir. 1984). In *Dennis*, eight of the fifteen Virgin Islands legislators sued the Governor to remove the Commissioner of Commerce from office. The Legislature had rejected Golden's nomination, nonetheless, a few months later the Governor appointed Golden as the "acting" Commissioner of Commerce. The Legislature sued in federal court asserting that the recess appointment "usurp[ed] the doctrine of separation of powers and circumvent[ed] the process of advice and consent, thus violating a basic constitutional power conferred upon the Legislature ... by the United States Congress. ..." *Id.* at 630 (omissions in original). After finding the Governor only had authority to make a recess appointment, the district court found Golden to be a recess appointee whose term had expired. The district court issued an injunction to remove Golden from office. The removal was stayed pending appeal to the Third Circuit. The Third Circuit held the eight members of the Legislature had standing:

> According to the legislators' allegations, the interest sought to be protected by this action is their unique statutory right to advise the Governor on executive appointments and to confer their approval or disapproval in this regard. Assuming these allegations to be true, we conclude that they allege a personal and legally cognizable interest peculiar to the legislators. *See Riegle v. Federal Open Market Committee*, 211 U.S. App. D.C. 284, 656 F.2d 873, 878-79 (D.C. Cir.), *cert. denied*, 454 U.S. 1082, 70 L. Ed. 2d 616, 102 S. Ct. 636 (1981). The interest asserted is simply not a "generalized interest of all citizens in constitutional governance. ..." *Valley Forge Christian College*, 102 S. Ct. at 769, quoting *Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. 208, 217, 41 L. Ed. 2d 706, 94 S. Ct. 2925 ([1974]). Since the right to advise and consent has been vested only in members of the legislature, and since only members of the legislature are bringing this action, the allegation that this right has been usurped by the Governor and Golden are sufficiently personal to constitute an injury in fact, thus satisfying the minimum constitutional requirements of standing.

*Id.* at 829 n.10 (quoting *United States v. Ballin*, 144 U.S. 1, 7, 12 S. Ct. 507, 36 L. Ed. 321 (1892)) (emphasis added).

We therefore believe that it is reasonable to hold that the legislators have standing.

*Dennis*, 741 F.2d at 631 (emphasis added).

The District Court of Idaho similarly has had an opportunity to address this issue. In *McClure v. Carter*, 513 F. Supp. 265, 269 (D. Idaho 1981), the district court specifically held that a United States Senator lacked standing to challenge the validity of the appointment of a federal judge. In that case, President Carter had nominated former Congressman Abner J. Mikva ("Mikva") to the United States Court of Appeals for the District of Columbia Circuit. *Id.* at 266. During Mikva's term in Congress, the salaries of federal judges was [sic] increased. *Id.* In his complaint, Senator McClure claimed that Mikva's nomination, confirmation, and appointment were in violation of the Ineligibility Clause of the Constitution which provides in relevant part "[n]o Senator or Representative shall, during the Time for which he was elected, be appointed to any civil Office under the Authority of the United States, which shall have been created, or the Emoluments whereof shall have been increased during such time." U.S. Const., Art. I, sec. 6.

The *McClure* Court found that Senator McClure lacked sufficient personal interest as a private individual to have standing. *McClure*, 513 F. Supp. at 270. The *McClure* Court also found that McClure lacked standing as a Senator because the effectiveness of his vote was not impaired. *Id.* Specifically, the court found:

> Senator McClure had the opportunity to persuade his colleagues to vote against the confirmation and, in the conscientious performance of his duties, Senator McClure did just that. That he and like-minded senators did not prevail in the Senate does not mean that the effectiveness of Senator McClure's vote was impaired within the meaning of *Coleman v. Miller*. It means merely that he was on the losing side. Certainly no one would contend, and we do not understand Senator McClure to contend, that the losing senators in any vote should automatically have the right to appeal to a federal court for a determination of the correctness of the result approved by the majority of their colleagues. If this were the case, federal courts would on such occasions be little more than legal advisors to the Congress, whose counsel could be obtained at the instance of any single member of that body. This would, of course, amount to

691

the giving of advisory opinions that, whatever their desirability in a particular case, we are forbidden to provide. Thus, at least without a statute authorizing such suits, Senator McClure lacks standing to challenge, either as an individual or as a Senator, the appointment of former Congressman Mikva to the Court of Appeals.

...

Under the Constitution, it was the duty of Congress itself, in the first instance, to determine Judge Mikva's qualifications both on the merits and on the issue of whether he was constitutionally eligible to serve as a judge. To allow members of Congress to change hats, as it were, to plead the unconstitutionality of their own acts before this court on the basis of an argument already debated in the Senate but lost there by vote, would, we suggest, set a dangerous precedent.

*McClure*, 513 F. Supp. at 270, 271.

Russell may be claiming a personal injury in that his duty as a legislator to give advice and consent regarding the nominations was arguably diminished when the Governor called a special session for the Legislature to consider nominations that were already before the Legislature. Russell, however, had the opportunity to question the nominees and vote on the confirmations. Russell voted in favor of confirming all three justices. Russell's vote was effective, unlike the state legislators in *Coleman* who had standing. *See McClure*, 513 F. Supp. at 270 (denying standing to U.S. Senator challenging validity of federal judge's confirmation noting that "merely [because] he was on the losing side" did not mean his vote was impaired in the sense of *Coleman*).

Furthermore, like the Congressmen in *Raines,* Russell seeks to vindicate the rights of an entire legislative body. This he cannot do. If the interest Russell seeks to protect is the right of the legislature to give advice and consent regarding nominations, then one individual legislator alone would not have standing. Only a majority of the Legislature could bring this action. *Raines,* 521 U.S. at 821, 826-30; *see also In re Senator Russell,* 2006 U.S. Dist. LEXIS 89537, at *9-13 (D.V.I. App. Div. Dec. 11, 2006); *cf. Dennis,* 741 F.2d at 631.

It is axiomatic that the legislature is a coequal branch of the government. *Frontiero v. Richardson,* 411 U.S. 677, 688, 93 S. Ct. 1764, 36 L. Ed. 2d 583 (1973). Having been advised of Russell's concerns, the

Legislature could have sent the nominations to committee, ended the special session, or voted against the nominees.

> MR. RUSSELL: And I objected to this entire proceeding prior to participating in the proceeding on October 27th. ... [B]efore the session proceeded, I attempted to move the consideration of the nominees to the committee on rules and judiciary as a procedural step to avoid the embarrassment and to avoid the confusion that could ensue if we were to consider these nominees, and more importantly, if we allow, if we were to allow the governor to call us into special session to consider nominees.

[Test. of Russell, Hr'g Tr. 24-25, Jan. 3, 2007.] Instead, the Legislature chose to proceed and overlook any problems that may have existed in the nomination process.

> MR. RUSSELL: That motion failed because the governor had already lobbied some Senators, and it was an election pending in 10 days to allow the nominations to go forward."

[*Id.* at 25.] *See McClure*, 513 F. Supp. at 271. That action in response to the Governor's call of a special session was consistent with the law. Rev. Org. Act of 1954 § 7.

While the outcome may not be what Russell desired, Russell cannot now turn to the Court to avail himself of relief he unsuccessfully sought from his colleagues in a co-equal branch of the government. Indeed, if this Court recognized legislator standing for that purpose, it would be in derogation of that bedrock Constitutional principle that requires separation of powers—the very thing of which Russell complains and against which *McClure* cautions.

While Russell points to *Silver v. Pataki*, 96 N.Y.2d 532, 755 N.E.2d 842, 730 N.Y.S.2d 482 (2001), to support his contention that he has legislator standing, that case is readily distinguishable. In *Silver,* the Speaker of the New York State Assembly voted with the majority of the Assembly in passing several appropriation bills and non-appropriation bills. 96 N.Y.2d at 535. The Governor of New York used his line-item veto power to remove provisions from the non-appropriation bills. *Id.* The Speaker of the Assembly sued the Governor asserting that the Governor did not have a right to use the line-item veto in non-appropriation bills. *Id.* The New York Court of Appeals explained that

the Speaker had standing because he suffered personal injury in that his vote was nullified:

> Here, plaintiff as a Member of the Assembly won the legislative battle and now seeks to uphold that legislative victory against a claimed unconstitutional use of the veto power nullifying his vote. If plaintiff's allegations are correct, and at this point in the litigation we must assume they are, the vetoed provisions were improperly invalidated and should be in effect. Such a direct and personal injury is clearly within a legislator's zone of interest and un-questionably represents a "'concrete and particularized'" harm. As Supreme Court noted, plaintiff is not "seeking to obtain a result in a courtroom which he failed to gain in the halls of the Legislature."

*Id.* at 540 (internal citations omitted) (emphasis added).

In contrast to the plaintiff in *Silver*, Russell has not sufficiently asserted a personalized injury. As Russell states in his complaint, he "simply seeks to protect the integrity; authority and purpose of the first branch of government; to have this court protect the rule of law and set the right example for the people of our territory by having our Supreme Court start by abiding with the law." [Compl. at 11-12.] He also fails to distinguish himself from every other member of the public when he asks this court to "[e]nter an order that may offer plaintiff and the people of this territory relief not specifically enumerated but that restores the integrity, authority and purpose of each branch of government as provided in the [Revised Organic Act] ..." [Compl. at 12.][8] For whatever political or other reasons, Russell voted in favor of the nominees. Russell had the opportunity to vote and did so. Unlike the plaintiff in *Silver*, Russell's vote was given full effect.

### IV. Conclusion

Act 6687 provides that the Governor "shall submit nominations for the associate justices of the Supreme Court to the Legislature within ninety days after the effective date of any act appropriating monies to fund the operations of the Supreme Court ... ." The Governor failed to submit

---

[8] Additionally, Russell's supplemental briefing, in response to the Court's December 20, 2006, order, does not indicate what, if any, particularized injury he has sustained.

nominations as required. However, Act 6687 does not include an explicit or implicit private cause of action for that failure.[9]

While Russell's complaint may be driven by a desire to seek compliance by the executive branch of government with legislative enactment, that desire, under these circumstances, is not supported by the law. Indeed, Senator Russell's first cause of action legally is unsustainable as it has neither been created by the Legislature nor recognized by the common law.

As to Count Two, Russell has failed to demonstrate how he has suffered a personal injury traceable to the Governor's delayed submission of the nominations, and he is therefore without standing to bring his claim. Moreover, the appropriate forum for Russell to raise his concerns regarding procedural defects in the nomination process was in the Legislature. He did so, yet the Legislature elected to proceed notwithstanding Russell's claims. It would be impossible for this Court to undertake its own independent resolution of Russell's claims without demonstrating a lack of respect to the Legislature. Thus, even if he had standing, the second claim raises a nonjusticiable political question.[10] Accordingly, the Court will dismiss the complaint.

An appropriate judgment follows.

---

[9] While Act 6687 uses the term "shall," there is no indication that the Legislature intended to strip the Governor of the authority to nominate after the deadline for nominations prescribed in Act 6687. *See, e.g., Shenango Inc. v. Apfel*, 307 F.3d 174, 193 (3d Cir. 2002) ("[A] statutory deadline does not, by itself, establish that Congress intended to strip an agency's authority to act after the deadline has passed.").

[10] At its core, Russell's claim presents the Court with the proscribed task of undertaking independent resolution without affording a coordinate branch of government its due respect. *Baker v. Carr*, 369 U.S. 186, 217, 82 S. Ct. 691, 7 L. Ed. 2d 663 (1962).